**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Angelino Paolo Buccheri-Bianca, | No. CV-15-00229-TUC-RM (BPV) |
| Petitioner, | **REPORT & RECOMMENDATION** |
| v. | |
| Charles L Ryan, et al., | |
| Respondents. | |

Pending before the Court is Petitioner's *pro se* Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Non-Death Penalty). (Doc. 1). Respondents have filed an Answer (Doc. 15) and, in response to the Court's Orders directing them to do so, Respondents have also filed a Supplemental Answer ("Supp. Answer") and exhibits (Docs. 18, 19, 20, 21, 22, 23). Petitioner did not file a reply to Respondents' Answer or Supplemental Answer, although permitted to do so.

Pursuant to the Rules of Practice of this Court, this matter was referred to the undersigned Magistrate Judge for a Report and Recommendation. For the following reasons, the Magistrate Judge recommends that the District Court dismiss and deny the Petition.

## I. Factual & Procedural Background

### A. State court proceedings

Petitioner Angelino Paolo Buccheri-Bianca was convicted after a jury trial of five counts of child molestation of three children. (Answer at 2 (citing Answer, Exh. A)). Petitioner was sentenced to concurrent and consecutive prison terms totaling 51 years. (*Id.* (citing Answer, Exh. B)). The court also entered a criminal restitution order.

(Answer, Exh. B at 4; Answer, Exh. F at 2).

Petitioner was indicted on nine counts of child molestation pertaining to four children who are siblings.[1] (Answer, Exh. F at 3-4). The Arizona Appellate Court described the facts established at trial as follows:

> In 2009, Buccheri–Bianca lived in the same apartment building as a family with five minor children, A[], M[], C[], K[1], and K[2]. He was in his late eighties and recently had broken his leg. The neighbor family occasionally helped him with errands, such as driving him to pick up groceries and prescriptions, and cleaning his apartment. Buccheri–Bianca sometimes asked the children to come to his apartment to pick up boxes of food, and he would give them candy and small gifts. Although the children's mother denied they ever had gone inside Buccheri–Bianca's residence, three of the children testified they had been in his apartment without other adults present and he had molested them.
>
> At trial, K[1] testified that occasionally he went to Buccheri–Bianca's apartment with his sisters M[] and C[], and Buccheri–Bianca would tell the sisters to leave, after which he would touch K[1]'s "private parts." When K[1] protested, Buccheri–Bianca would use a "thick, brown rope" to tie his hands. Buccheri–Bianca never did this while K[1]'s siblings were present, and after the incidents threatened K[1] that if he told anyone about the touching, Buccheri–Bianca would kill his whole family.
>
> M[] testified she would sometimes go with her sister C[] to Buccheri–Bianca's apartment in order to pick up food that he would give to the family, and he would invite them inside. M[] told the jury about an occasion on which the two girls went to Buccheri–Bianca's apartment to get cooking oil, and he touched her vagina, over her clothes, in the kitchen. She stated he had touched her on multiple occasions in the kitchen. M[] also described a separate instance in which Buccheri–Bianca had pulled down C[]'s pants and touched her vagina in the bedroom of the apartment. M[] noted that she had seen him touch C[] on at least one other occasion as well. Finally, M[] testified that Buccheri–Bianca told her and C[] that if they told on him, he was going to kill their family.
>
> C[] too testified that Buccheri–Bianca would touch her and M[] together. C[] described two incidents in which Buccheri–Bianca partially removed her pants and touched her vagina in the living room of his apartment but denied he had ever touched her in his bedroom. C[] further

---

[1] The siblings are sisters A, M and C, and their brothers K1 and K2. The appellate court used pseudonym's for the children's names in its opinion. (*See* Answer, Exh. F at 2 n.1). In accordance with Fed.R.Civ.P. 5.2(a) and General Order 08-11, this Court refers to the children by their first initials. Because both of the boys have the same initials, the Court refers to the older boy as K1 and the younger as K2.

stated she had observed Buccheri–Bianca do the same thing to M[] and he had threatened to kill the girls' brother if they told anyone.

In November or December 2010, M[] reported the molestation to a counselor at her school. Buccheri–Bianca subsequently was indicted on nine counts of child molestation involving M[], C[], K[1], and K[2]. He was convicted of five counts involving M[], C[], and K[1]…."

(Answer, Exh. F at 2-4) (footnotes omitted).  K2 "told a forensic interviewer that Buccheri-Bianca had touched his penis on multiple occasions, but at trial he testified he could not remember having been touched.  The jury acquitted Buccheri-Bianca of the counts of the indictment relating to K[2]."  (*Id.* at 2 n. 2).

Petitioner, through counsel, directly appealed his convictions, arguing:

1.     the trial court improperly precluded impeachment evidence of the victims' immigration status, resulting in denial of Petitioner's right to confront and cross-examine witnesses against him;

2.     prosecutorial misconduct;

3.     the trial court erred by allowing amendment of the indictment to conform to the evidence;

4.     the trial court improperly admitted expert witness testimony;

5.     the trial court improperly admitted portions of Petitioner's recorded jail conversations; and

6.     the evidence was insufficient to sustain a guilty verdict on the five counts for which Petitioner was ultimately convicted.

(Answer at 2 (citing Answer, Exhs. C, D, E)).  In a published opinion, *State v. Buccheri-Bianca,* 233 Ariz. 324, 312 P.3d 123 (App. 2013), the appellate court affirmed Petitioner's convictions and sentences, but vacated the entry of the criminal restitution order.  (Answer, Exh. F).  On February 11, 2014, the Arizona Supreme Court summarily denied Petitioner's Petition for Review.  (Answer at 2 (citing Answer, Exh. G)).

On February 26, 2014, Petitioner filed a Notice of Post- Conviction Relief ("PCR") before the trial court pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  (Answer, Exhs. H). After Petitioner's appointed counsel filed a notice that no

basis for post-conviction relief was apparent, the court granted Petitioner several extensions of time to file a *pro se* PCR Petition. (*See* Answer, Exh. I at 2). Petitioner failed to file a substantive petition, and the state filed a motion to dismiss the Rule 32 proceedings. (*Id.*). On April 14, 2015, the trial court "reviewed the file for error" could not "find any material issue of fact or law that would entitle the Defendant to relief under Rule 32 and [found] that no further purpose would be served by any further proceedings." (*Id.* at 2-3). Consequently, the trial court granted the state's motion to dismiss the PCR action. (*Id.* at 3). Petitioner did not seek appellate court review of the trial court's decision in his PCR Proceeding. (Answer at 3).

### B. Petitioner's Federal Habeas Petition

In June 2015, Petitioner filed the instant federal habeas petition. Petitioner raises the following grounds for relief:

**Ground One:** Ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution;

**Ground Two:** Petitioner's rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated by: (1) the trial court's preclusion of evidence of the victims' immigration status; and (2) prosecutorial misconduct based on the prosecutor's argument to the jury that the victims had no motive to lie;

**Ground Three:** Petitioner's rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court allowed the state to amend the indictment and denied Petitioner's motion for judgment of acquittal;

**Ground Four:** Cruel and unusual punishment in violation of the Fifth and Eight Amendments to the United States Constitution.

(Petition at 6-9).

Respondents do not contest the timeliness of the Petition. (*See generally* Answer). They argue that certain grounds for relief are barred from federal habeas review because

the claims are procedurally defaulted and other grounds are without merit.

## II. Discussion

### A. Exhaustion and procedural default

Respondents contend that Grounds One, Two, Four, and a portion of Ground Three are procedurally defaulted from federal habeas review.

#### 1. Standard of Review for Exhaustion and Procedural Default

Because Petitioner's federal habeas petition was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), 28 U.S.C. § 2254. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state court remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). "In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 n. 3 (9th Cir.2005) (quoting *Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir. 1999)).

A claim is fairly presented if the petitioner has described the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277–78 (1971). A petitioner must clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). He must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief ("PCR") proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify his omission of the claim from a prior petition or his failure to present the claim in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)–(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729–30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz (Ignacio) v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (explaining that the district court must consider whether the claim could be pursued by any presently available state remedy). Therefore, in the present case, if there are claims that were not raised previously in state court, the Court must determine whether Petitioner has state remedies currently available to him pursuant to Rule 32. *See Ortiz (Ignacio)*, 149 F.3d at 931. If no remedies are currently available, Petitioner's claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1.

If there are claims that were fairly presented in state court but found defaulted on state procedural grounds, such claims will be found procedurally defaulted in federal court so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit has repeatedly determined that

Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Hurles v. Ryan*, 752 F.3d 768, 780 (9th Cir. 2014) (Arizona's waiver rules are independent and adequate bases for denying relief); *Ortiz (Ignacio)*, 149 F.3d at 932 (Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (finding Arizona not "irregular" in application of procedural default rules); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) (same).

Nonetheless, because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, however, the Court will not review the merits of a procedurally defaulted claim unless the petitioner demonstrates legitimate cause for his failure to exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750. *But see Martinez v. Ryan*, 566 U.S. 1, 13-14 (2012) (the Supreme Court, has recognized a "narrow exception" to *Coleman's* procedural default principle by holding that: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.").

Generally, "cause" for a procedural default exists if the petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Coleman*, 501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, the petitioner bears the burden of showing not merely that the errors at his trial were possibly prejudicial, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

A habeas petitioner "may also qualify for relief from his procedural default if he

can show that the procedural default would result in a 'fundamental miscarriage of justice.'" *Cook v. Schriro*, 538 F.3d 1000, 1028 (9th Cir. 2008) (citing *Schlup v. Delo*, 513 U.S. 298, 321(1995)). *See also Majoy v. Roe*, 296 F.3d 770, 776–777 (9th Cir. 2002) (analyzing this exception in a non-capital case). This exception to the procedural default rule is limited to habeas petitioners who can establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" *Schlup*, 513 U.S. at 327; *see also*, *Murray,* 477 U.S. at 496; *Cook*, 538 F.3d at 1028. "'To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eye-witness accounts, or critical physical evidence—that was not presented at trial.'" *Cook*, 538 F.3d at 1028 (quoting *Schlup*, 513 U.S. at 324).

### 2.    Ground One

In Ground One, Petitioner claims he was denied ineffective assistance of counsel at trial. (Petition at 6). Respondents argue that Petitioner did not present this claim to the state court. Given that Petitioner never filed a substantive PCR Petition or memorandum, it does not appear that he raised these claims during the PCR proceeding, although the trial court noted that Petitioner's Notice of Post-Conviction Relief "suggested there may be a claim of ineffective assistance of trial counsel...." (Answer, Exh. I at 2). In any event, Petitioner did not seek appellate court review of the trial court's ruling in his PCR proceeding. To exhaust state remedies, Petitioner must have presented his claims to the appellate court, *see e.g., Castillo,* 399 F.3d at 998 n.3, which he did not do. Ground One is unexhausted.

### 3.    Ground Two

In Ground Two, Petitioner claims that his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution were violated when: (1) the trial court erroneously precluded evidence regarding the victims' motive to lie; and (2) the prosecutor engaged in misconduct by arguing that the victims had no motive to lie, despite knowing that evidence of such motive had been precluded. (Petition at 7). Petitioner's Ground Two

incorporates two claims that were raised separately on direct appeal concerning the trial court's decision to preclude evidence of the victims' immigration status. (*See* Answer, Exh. C at 22-29 ("Argument 1" regarding cross-examination), 29-33 ("Argument 2" regarding prosecutorial misconduct)).

With regard to Petitioner's right to confront witnesses against him, Petitioner argued on direct appeal that the trial court's preclusion of the impeachment evidence "denied [Petitioner] his rights to confront and cross examine the witnesses pursuant to the U.S. Constitution, the Arizona Constitution, and *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354 (2004). Criminal defendants have the right under the Sixth and Fourteenth Amendments to the U.S. Constitution to confront the witnesses against them, including the right to challenge the reliability and credibility of those witnesses." (Answer, Exh. C at 28; *see also id.* at 26 (asserting that "[t]he Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution guarantee the right of a defendant in a criminal trial to confront and cross-examine the witnesses against him.")). In deciding this issue, the Arizona appellate court acknowledged that Petitioner "claim[ed] that the limitation on cross-examination violated his constitutional right to confrontation and to present a theory of defense. *See generally,* U.S. Const. amend. VI; *Crawford v. Washington,* 541 U.S. 36 (2004))". (Answer, Exh. F at 6). Given Petitioner's citation to the Sixth and Fourteenth Amendments and pertinent case law on the issue regarding his right to confront the witnesses against him, the Court concludes that he has exhausted the first part of his Ground Two claim, and the claim should be addressed on the merits.

With regard to the second part of Ground Two, the Court agrees with Respondents that Petitioner failed to fairly present a federal claim. Although Petitioner raised the issue of prosecutorial misconduct in his brief on direct appeal, (*see* Answer, Exh. C at 29-33), he did not alert the state court that he was raising a federal constitutional issue. Mere similarity between a claim raised in state court and a claim in a federal habeas petition is insufficient to satisfy the fair-presentation requirement. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995). Consequently the claim is not exhausted.

### 4.    Ground Three

In Ground Three, Petitioner claims that his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution were violated when the trial court improperly:  (1) permitted the indictment to be amended and, in turn, denied Petitioner's motion for acquittal.  (Petition at 8).  Respondents argue that the portion of Ground Three regarding amendment of the indictment is not exhausted.  In challenging the trial court's ruling permitting amendment of the indictment, Petitioner did not raise a claim grounded in federal statutory or constitutional law.  (*See* Answer, Exh. C at 34-38).  Likewise, the appellate court resolved the issue applying state procedural and case law.  (*See* Answer, Exh. F at 8-12).  Because Petitioner did not fairly present the federal claim he presents here challenging amendment of the indictment, that claim is unexhausted.  *See e.g. Duncan,* 513 U.S. at 365-66 (similarity between claim raised in state court and federal habeas action is insufficient for purposes of exhaustion).

### 5.    Ground Four

In Ground Four, Petitioner claims that his sentence constitutes cruel and unusual punishment in violation of the Fifth and Eighth Amendments to the U.S. Constitution. (Petition at 9).   Respondents are correct that this claim is not exhausted because Petitioner did not raise the issue in the state court.  (*See* Answer at 5).

### 6.    Procedural Default

Not only has Petitioner failed to exhaust the claims he raises in Grounds One and Four in their entirety, and Ground Two with regard to prosecutorial misconduct, and Ground Three with regard to amendment of the indictment, but these claims are also procedurally defaulted.  Pursuant to Rule 32.2(a), Petitioner would no longer have a remedy if he returned to the Arizona courts to present the claims he raises here.  Further, the time has now passed to seek such review.  See Ariz.R.Crim.P. 32.4(a); *see also Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir 2002) (a state post-conviction action is futile when it is time-barred).  Nor do the claims qualify for any of the timeliness exceptions. *See* Ariz.R.Crim.P. 32.1(d)-(h). Thus, any additional petition would be subject to summary

dismissal. *See State v. Rosario,* 195 Ariz. 264, 266, 987 P.2d 226, 228 (App. 1999); *State v. Jones*, 182 Ariz. 432, 897 P.2d 734 (App. 1995); *Moreno v. Gonzalez*, 192 Ariz. 131, 135, 962 P.2d 205, 209 (1998) (timeliness is a separate inquiry from preclusion). The procedural timeliness bar of Rule 32.4(a) is clear, consistently applied, and well established. *Powell v. Lambert*, 357 F.3d 871 (9th Cir. 2004); *see e.g., Rosario*, 195 Ariz. 264, 987 P.2d 226 (where petitioner did not raise claims pursuant to Rule 32.1(d) through (g), the petition could be summarily dismissed if untimely); *Jones*, 182 Ariz. at 434, 897 P.2d at 736; *see also Wagner v. Stewart*, 2008 WL 169639, *9 (D. Ariz. Jan. 16, 2008). On the instant record, Petitioner's claims are procedurally defaulted. *Smith v. Baldwin,* 510 F.3d 1127, 1139 (9th Cir. 2007) ("[W]here a petitioner did not properly exhaust state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the petitioner's claim is procedurally defaulted.") (*quoting Coleman*, 501 U.S. at 735 n. 1); *Park v. California*, 202 F.3d 1146, 1150–51 (9th Cir. 2000) (federal habeas review is precluded where petitioner has not raised his claim in the state courts and the time for doing so has expired); *Parra v. Ryan*, No. 2014 WL 3747635 at *4 (D. Ariz. July 30, 2014) (same).

Petitioner has not argued or otherwise shown cause or prejudice to overcome the procedural default in this case. Nor has he argued that a fundamental miscarriage of justice has occurred which would require this Court to address his claims on the merits. Accordingly, the District Court should dismiss Petitioner's Grounds One and Four in their entirety as procedurally defaulted. Additionally, the District Court should also dismiss as procedurally defaulted that portion of Ground Two alleging prosecutorial misconduct and that portion of Ground Three challenging amendment of the indictment.

**B.    Merits Review**

Respondents contend that the portions of Grounds Two and Three that are exhausted should be denied on the merits.

### 1.   Standard for Review of Habeas Claims on the Merits

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court may not grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the merits in state court proceedings unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* at § 2254(d)(2).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court conviction became final. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Renico v. Lett*, 559 U.S. 766, 778–79 (2010)); *see Carey v. Musladin*, 549 U.S. 70, 76–77 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams,* 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Duhaime v. Duchame,* 200 F.3d 597, 601 (9th Cir. 2000).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407. For a federal court to

find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002).

The Supreme Court has emphasized that "an *unreasonabl*e application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). Under AEDPA, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 562 U.S. at 101. Accordingly, to obtain habeas relief from this Court, Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014) ("[I]f all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.").

With respect to § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341–342 (2006) (internal quotation marks and citation omitted); see *Hurles v. Ryan,* 752 F.3d 768, 778 (9th Cir. 2014) (explaining that on habeas review a court "cannot find that the state court made an unreasonable determination of the facts in this

case simply because [the court] would reverse in similar circumstances if th[e] case came before [it] on direct appeal"). Rather, as the Ninth Circuit has explained, to find that a factual determination is unreasonable under § 2254(d)(2), the court must be "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogated on other grounds as discussed in Murray (Robert) v. Schriro,* 745 F.3d 984, 999–1000 (9th Cir. 2014). "This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor,* 366 F.3d at 1000.

The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." § 2254(e)(1). The Supreme Court has not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), but has clarified "'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *See Burt v. Titlow*, __ U.S. __, 134 S.Ct. 10, 15 (2013) (quoting *Wood*, 558 U.S. at 293, 301).

Significantly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see Murray (Robert),* 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n. 6 (D. Ariz. 2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 184 n. 7). Therefore, the Ninth Circuit has explained:

> [F]or claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Gulbrandson,* 738 F.3d at 993–94 (internal citation omitted).

### 2. Ground Two: Right to confront witnesses

Petitioner claims that his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution were violated when the trial court precluded evidence regarding the victims' motive to lie, thus infringing on Petitioner's right to confront the witnesses against him.

### a. State Court Record

### (1.) Trial Court

Prior to trial, Petitioner filed a notice of intent to introduce evidence pertaining to an I-918 form completed on behalf of M in approximately October or November 2011, several months after the she reported Petitioner's conduct. (Supp. Answer, Exh. A-1; *see also* Supp. Answer, Exh. B-1 (Petitioner's offer of proof)). Petitioner intended to introduce the evidence to show that the victims had "a motive, interest, preparation, or plan to fabricate or exaggerate these sexual allegations…" in order to obtain legal status in the United States. (Supp. Answer, Exh. B-1 at 3).

The I-918 form was completed "pursuant to a request for a U-Visa, which allows material witnesses to [certain enumerated] crimes a visa to stay in the U.S. for the purposes of prosecuting those crimes."[2] (Supp. Answer, Exh. A-1 (Doc. 20 at 5[3])). Petitioner's offer of proof indicated that that prior testimony by the children's mother at a hearing on a restraining order revealed the family was in the country illegally. (Supp. Answer, Exh. B-1 at 1). Petitioner's expert would testify in pertinent part that: the U-Visa had derivative benefits to the minor applicant's parents and unmarried siblings so

---

[2] An applicant may not submit an U-Visa application without first obtaining a law enforcement certification from a federal, state or local law enforcement official, prosecutor, judge, or other federal, state, or local authority investigating the criminal activity described in 8 U.S.C. § 1101(a)(15)(U)(iii), stating that the alien "'has been helpful, is being helpful, or is likely to be helpful' in the investigation or prosecution of…" such criminal activity. 8 U.S.C. § 1184(p)(1).

[3] Because Exhibit A-1 does not have internal page numbers, the Court cites to the page numbers assigned by the Court's electronic filing system (CM/ECF), which appear at the top of each page of the document.

that any benefits available to M would apply to her entire family; a U-Visa lasts for four or more years; U-Visa holders have a substantially short wait time to obtain permanent lawful residence; and "the existence and benefits of U-Visas are very widely and well known within the legal immigrant community." (*Id.* at 3).

The state filed a motion in limine requesting the court to limit the admission of evidence relating to M's completion of the I-918 form, including "speculat[ion]" about the victims' immigration status and that the victims' made the allegations against Petitioner in order to obtain a green card. (Supp. Answer, Exh. A-1 (Doc. 20 at 6)). The state stressed that "Defendant cannot show that the victims would even be aware of the possibility of converting the U-Visa to a green card." (*Id.* (Doc. 20 at 7)).

At oral argument, defense counsel argued that the fact that M applied for the U-Visa months after she made her report did not militate against a showing that the allegations were fabricated in order to obtain a visa because the U-Visa is available only after allegations have been made and the County Attorney certifies that the person is assisting in the investigation or will testify. (Exhibit to Respondents' "Response to the Court's Order of 10/11/17" (Doc. 23-1) at 20 (transcript of hearing on motion)). In response, the prosecutor stressed, in addition to the points advanced in its motion, that M reported the molestation at her school and her

> mother was told to come to the school…not knowing what these allegations were. When she heard that her daughter was saying that she had been molested she broke down crying and said she didn't believe it. She couldn't believe something like that had happened.
>
> That knowledge didn't exist with the mother. It didn't exit with M[]. This application is almost a year later.
>
> We're bringing in an extremely inflammatory issue or [defense counsel] is trying to bring in an extremely inflammatory issue with just such little proof. I'm asking the Court to exclude it on relevance grounds and 403.

(*Id.* at 26).

In granting the prosecution's motion, the court stated that it considered: "the date of the original disclosures and allegations, being almost a year before the application for the U-visa or I-918[]"; "the circumstances surrounding the disclosure in this case by the

alleged minor victim at her school setting"; and "everything" that was provided by both parties. (*Id.* at 27). Ultimately, the court found "that any mention of any kind of the immigration status of the alleged victim, her siblings, her parents is simply not relevant." (*Id.*; *see also id.* ("The Court gives a lot of latitude to cross-examination on bias, but the Court finds under all the circumstances it is simply not relevant in this case."); Supp. Answer, Exh. C-1 at 2 (trial court's minute entry holding that "any mention of any kind of the immigration of the alleged victims, siblings, or parents is not relevant.")). The child victims and their mother testified at the trial and were made available for cross-examination. (Supp. Answer at 6 (citing R.T. 5/2/12 at 16-24, 45-64, and 84-125); *see also* Supp. Answer, R.T. 5/2/12 at 128-48; Supp. Answer, R.T. 5/1/12 at 182-221).

(**2.**)   **Direct Appeal**

Petitioner argued on direct appeal that that the trial court's preclusion of the impeachment evidence "denied [Petitioner] his rights to confront and cross-examine the witnesses pursuant to the U.S. Constitution, the Arizona Constitution, and *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354 (2004). Criminal defendants have the right under the Sixth and Fourteenth Amendments to the U.S. Constitution to confront the witnesses against them, including the right to challenge the reliability and credibility of those witnesses." (Answer, Exh. C at 28; *see also id.* at 22-29).

In denying Petitioner's appeal, the appellate court recognized that "[t]rial courts retain wide latitude to impose reasonable limits on cross-examination to prevent confusion of the issues or interrogation that is only marginally relevant. This latitude includes the discretion to preclude evidence of immigration status if it is collateral to the issues at trial and would potentially confuse the jury." (Answer, Exh. F at 5 (internal quotation marks and citations omitted)). The court noted that parents and siblings of victims are eligible to obtain U-Visas under the victims' application and that "[a]lthough the U–Visa provides only a temporary authorization, the Secretary of Homeland Security may confer permanent-resident status on an alien who has held a U–Visa for three years." (*Id.* at 4 n.3 (citations omitted)). The court pointed out that "nothing in the record shows

that M[] or her family members knew about the U-Visas when M[] reported the molestation to her teacher[]", (*id.* at 5 (internal quotation marks omitted)). The court also recognized that M "did not obtain support from the state for her visa application until November 2011—nearly a year after she made her initial allegations in late 2010." (*Id.* (footnote omitted)). The court went on to state:

> Although an alien cannot be eligible for a U-Visa unless the underlying crime has first been reported, [8 C.F.R.] §214.14(c)(2)(i), the great length of time between when M[] first reported the molestation and the time she filed her application supports the court's conclusion that the possibility of obtaining a U–Visa was not relevant to her accusation.
>
> Furthermore, the record does not contain evidence that M[] or any member of her family had unauthorized status. Although a U–Visa may provide relief from removal for an unauthorized alien, [8. U.S.C.] §§ 1101(a)(15)(U) and 1184(p) do not require that an alien be unauthorized in order to apply. And, even if the victims in this case were unauthorized and such evidence did have some probative value, the trial court could implicitly conclude, as argued by the state, that any probative value would have been outweighed by the risk of unfair prejudice and confusion of the issues stemming from a collateral mini-trial on the victims' immigration status. *See* Ariz. R. Evid. 403. We find no abuse of discretion.
>
> We also disagree with Buccheri–Bianca's claim that the limitation on cross-examination violated his constitutional right to confrontation and to present a theory of defense. *See generally* U.S. Const. amend. VI; *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because he did not make these constitutional arguments in the trial court, we review them for fundamental error. *See State v. Henderson,* 210 Ariz. 561, ¶ 19, 115 P.3d 601, 607 (2005). The rights asserted are "limited to evidence which is relevant and not unduly prejudicial," *State v. Oliver,* 158 Ariz. 22, 30, 760 P.2d 1071, 1079 (1988), and, as discussed above, evidence of the victims' immigration status was properly excluded. Buccheri–Bianca's constitutional rights therefore were not violated. *See State v. Davis*, 205 Ariz. 174, ¶ 33, 68 P.3d 127, 132 (App.2002).

(Answer, Exh. F at 5-6).

Because Petitioner's Petition for Review by the Arizona Supreme Court was summarily denied, the appellate court's decision is the last-reasoned state-court decision on this issue.

### b.    Standard on Habeas Review

The Sixth Amendment right to confrontation includes the right to cross-examine

adverse witnesses. *Olden v. Kentucky*, 488 U.S. 227, 231, (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986). The Supreme Court has "'recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Id.* at 678-79 (*quoting Davis v. Alaska,* 415 U.S. at 308, 316-17 (1974)). However, the Supreme Court has also recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* "Any such '[r]estrictions on a criminal defendant's rights to confront adverse witnesses,' however, 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Ortiz (Adilao) v. Yates,* 704 F.3d 1026, 1035 (9th Cir. 2012) (quoting *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (*quoting Rock v. Arkansas*, 483 U.S. 44, 56 (1987)); citing *Chambers v. Mississippi*, 410 U.S. 284, 295(1973)). In sum,

> "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'"

*Id.* (quoting *Van Arsdall,* 475 U.S. at 680 (quoting *Davis,* 415 U.S. at 318)).

A violation of the Confrontation Clause does not result in automatic reversal. Instead, where a violation of the Confrontation Clause is found, the court must assess whether the error had prejudicial impact under *Brecht v. Abrahamson,* 507 U.S. 619, 623, (1993). *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011). Under harmless error analysis, "[h]abeas relief is warranted only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Brecht*, 507 U.S. at 637–38). To determine whether a violation of the Confrontation Clause had "substantial and injurious effect," the court is to apply the five non-exclusive factors set forth in *Van Arsdall*: (1) the importance of the witness' testimony in the prosecution's case; (2)

whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.* at 455 (*citing Van Arsdall*, 475 U.S. at 679).

### c. Analysis

At the outset, the appellate court in Petitioner's case cited the Sixth Amendment and *Crawford*, but did not cite other Supreme Court cases on the issue, such as *Lucas,* in reaching its conclusion. However, "a state court need not cite or even be aware of [the Supreme Court's] cases…'" for purposes of analysis under § 2254(d). *Richter,* 562 U.S. at 98 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)). "In such circumstances, 'a habeas court must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" *Ortiz (Adilao)* 704 F.3d at 1035 (quoting *Richter*, 562 U.S. at 102).

The Ninth Circuit employs a two-part test to determine whether a trial court's limitations on cross-examination was objectively unreasonable under the AEDPA. *Ortiz (Adilao),* 704 F.3d at 1035 (citing *Fowler, v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1038 (9th Cir. 2005)). On habeas review, the court must first inquire "'whether the proffered cross-examination sufficiently bore upon [the witness'] reliability or credibility such that a jury might reasonably have questioned it.'" *Id.* (quoting *Fowler,* 421 F.3d at 1038); *see also id.* at 1036 (restating the inquiry as whether the "proffered cross-examination sufficiently bore upon [the witness' reliability or] credibility such that no fairminded jurist could disagree that the cross-examination could have influenced the jury's assessment of [the witness].") If so, the reviewing court must then "consider 'whether the trial court's preclusion of this cross-examination was unreasonable, arbitrary or disproportionate' in light of any 'countervailing interests' justifying preclusion, such as 'waste of time, confusion and prejudice.'" *Id.* at 1035-36 (quoting *Fowler*, 421 F.3d at

1038, 1040) (other citation omitted).

As to the first inquiry, the Ninth Circuit has "explained that cross-examination may implicate the Sixth Amendment even if it is not certain to affect the jury's assessment of the witness's reliability or credibility….[I]t is sufficient that a jury might reasonably have questioned the witness's reliability or credibility in light of the cross-examination." *Ortiz (Adilao),* 704 F.3d at 1036 (internal quotation marks and citation omitted). Here, M, a special education student, was the first of her siblings to report the molestations. She did so when she was called into the vice-principal's office "about a problem that had…" arisen with an older, substitute teacher who was giving the children "cookies and money." (Supp. Answer, R.T. 5/2/12 at 132 (M's mother testifying that M was called to the vice-principal's office); *id.* at 83-84 (M testifying as to same); *but see* Supp. Answer, R.T. 5/2/12. at 36 (M's teacher testifying that M told the school counselor). *See also* Supp. Answer, R.T. 5/2/12 at 35 (special education)). M's mother testified that before M's report, she was unaware of any such incidents between Petitioner and her daughters. (Supp. Answer, R.T. 5/2/12 at 132). M's report occurred after her family had moved away from the apartment complex where Petitioner lived. (*Id.* at 83, 134).

The apparent motive ascribed by the defense to M and her siblings for making the allegations against Petitioner was that the family wanted to take advantage of the criminal proceeding to obtain legal status in the United States through first applying for a U-Visa, in hope of then converting that status into a more permanent status. It is doubtful, at best, that the jury would have reasonably questioned the children's credibility given the attenuated circumstances surrounding M's report, the victims' young ages, and the intricacies of immigration law. While the defense expert was prepared to "testify that the benefits of U-Visas are very widely and well known within the illegal immigrant community[]", (Supp. Answer, Exh. B-1 at 3), even if a proper foundation could be laid for this testimony and even if the victims and their family were illegally within the country, it is highly doubtful M and her siblings would have understood the implications

that involvement in a criminal proceeding regarding certain crimes could have on the prospect of obtaining legal status, causing M to make her report to at the school. The instant record does not support the conclusion that a jury "might reasonably have questioned the [victims'] credibility or reliability…" had the cross-examination been permitted. *Ortiz (Adilao),* 704 F.3d at 1036 (internal quotation marks and citation omitted). Thus, the state court reasonably concluded that the victims' immigration status was not relevant.

Even if the first inquiry could be answered in Petitioner's favor, he fails to satisfy the second inquiry. The second inquiry concerns whether the trial court's preclusion of this cross-examination was unreasonable, arbitrary or disproportionate in light of any countervailing interests justifying preclusion, such as waste of time, confusion and prejudice. *See Ortiz (Adilao),* 704 F.3d at 1035-36. The state court found that any probative value cross-examination on this topic might have was outweighed by unfair prejudice and confusion based upon "issues stemming from a collateral mini-trial on the victims' immigration status." (Answer, Exh. F at 5-6). Such a conclusion was not objectively unreasonable in the context of this case. Factors supporting the state court's decision include the way in which the report arose at M's school, long after the alleged molestation occurred, thus it was not as if the family went to the police to report a crime in hope of spurring a criminal proceeding that would bring a U-Visa into play. Other factors include the length in time between the incidents, the report, and the application for a U-Visa,[4] and there was no indication that the victims' and their family knew about the benefits of a U-Visa. It was also objectively reasonable for the state court to conclude that introduction of evidence that M had applied for a U-Visa would have resulted in a "mini-trial" about the victims' immigration status and the interplay of immigration law, thus confusing the issues. It also follows that a "mini-trial" on the issue would have wasted time, as well. At best, the introduction of the fact that M had applied for a U-Visa

---

[4] Although the underlying crime must be reported before a U-Visa may be sought, several months passed before the U-Visa was requested, suggesting that it was not of paramount concern to the victims' family.

was to suggest and/or bring out to the jury the prejudicial issue that she and her family were in the country illegally. "'[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Van Arsdall,* 475 U.S. at 679 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (emphasis in original)). In sum, the state court's preclusion of cross-examination regarding the victims' immigration status was not unreasonable, arbitrary or disproportionate in light of any countervailing interests justifying preclusion, including prejudice, confusion, and waste of time.

For the foregoing reasons, the state court's decision precluding cross-examination regarding the victims' immigration status did not result in a decision that was contrary to, or that involved an unreasonable application of, clearly established Federal law. Nor was the state court's decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner's Ground Three claim on this issue is without merit and should be denied.

### 3. Ground Three: Sufficiency of the Evidence

Petitioner argues that his rights under the Fourteenth and Sixth Amendments to the U.S. Constitution were violated when the trial court denied his motion for judgment of acquittal. Respondents have treated this argument as a claim that the evidence presented was insufficient to support a finding that Petitioner had committed the offenses of which he was convicted. (Answer at 10-12; *see also id.* at 12 (arguing that "the State court's conclusion that sufficient evidence supported the convictions was not an objectively unreasonably application of *Jackson*" *v. Virginia,* 443 U.S. 307 (1979)).

The primary focus of Ground Three is on Petitioner's argument that his rights were violated when, following presentation of the state's case, the trial court permitted the indictment to be amended regarding the location where the alleged molestation occurred with regard to C. (Petition at 8; *see also* Answer, Exh. F at 9 & n. 5 (noting that "'touching genitals skin to skin in the kitchen'" in count one was amended to "'touching genitals skin to skin on one occasion," and the allegation of the same offense occurring in

the bedroom in count two was amended to "alleg[ing] [Petitioner] had committed the same offense against the same victim by 'touching genitals skin to skin on a second occasion.'")). As discussed *supra,* that claim is procedurally defaulted. Although reading into Ground Three a claim of insufficiency of evidence to support the conviction on the five counts (post-amendment) for which Petitioner stands convicted requires a stretch, the Court will address such a claim given Respondents' concessions that Petitioner advances that claim in Ground Three and that Petitioner has exhausted that claim, as well.

### a. The state court decision

The indictment alleged that the molestations occurred on or about August 1, 2008 through on or about December 31, 2009. (*See* Supp. Answer, R.T. 5/1/12 at 154-57). The jury found Petitioner guilty of: touching C's genitals skin to skin on one occasion as alleged in Count One; touching C's genitals skin to skin on a second occasion as alleged in Count Two; touching M's genitals over clothes in the kitchen as alleged in Count Three; touching M's genitals over clothes in the living room as alleged in Count Four; and touching K1's penis as alleged in Count Five. (Answer, Exh. A). The jury also found that the children were each under 15 years of age when the incidents occurred. (*Id.*).

Petitioner argued on direct appeal that the evidence was insufficient to sustain the guilty verdicts primarily based upon inconsistencies in the victims' testimony. (Answer, Exh. C at 46-50). Petitioner also pointed out that but for the amendment of the indictment, the evidence would have been insufficient to support a conviction of counts one and two. (*Id.* at 46-50).

The appellate court rejected Petitioner's claim as follows:

> Finally, Buccheri–Bianca argues that the evidence was insufficient to sustain his convictions. "This question of sufficiency of the evidence is one of law, subject to de novo review on appeal." [*State v.*] *West*, 226 Ariz. 559, ¶ 15, 250 P.3d [188] at 1191 [(2011)]. "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* ¶ 16, [*State v.*]

*Mathers*, 165 Ariz. at [64] 66, 796 P.2d at [866] 868 [(1990)]. Thus, "[w]hen reasonable minds may differ on inferences drawn from the facts, the case must be submitted to the jury, and the trial judge has no discretion to enter a judgment of acquittal." *State v. Lee*, 189 Ariz. 590, 603, 944 P.2d 1204, 1217 (1997).

To sustain Buccheri–Bianca's conviction for molestation of a child, the record must reflect, with respect to each of the victims, substantial evidence that he "intentionally or knowingly engag[ed] in or caus[ed] a person to engage in sexual contact, except sexual contact with the female breast, with a child who is under fifteen years of age." § 13–1410(A). For purposes of the child-molestation statute, sexual contact includes "any direct or indirect touching, fondling or manipulating of any part of the genitals [or] anus ... by any part of the body or by any object." § 13–1401(2).

Buccheri–Bianca does not argue the state failed to present evidence of the elements listed above but rather contends the victims' testimony was "grossly inconsistent and grossly vague," suggesting the jury should not have believed them. But "'[n]o rule is better established than that the credibility of the witnesses and the weight and value to be given to their testimony are questions exclusively for the jury.'" *State v. Cox*, 217 Ariz. 353, ¶ 27, 174 P.3d 265, 269 (2007), quoting *State v. Clemons*, 110 Ariz. 555, 556–57, 521 P.2d 987, 988–89 (1974). It is not the province of an appellate court to reweigh evidence or reassess the witnesses' credibility. *Lee*, 189 Ariz. at 603, 944 P.2d at 1217; *State v. Cid*, 181 Ariz. 496, 500, 892 P.2d 216, 220 (App.1995). Rather, we view the facts in the light most favorable to upholding the determination of the jury. *State v. Miranda–Cabrera*, 209 Ariz. 220, 221–22, 99 P.3d 35, 36–37 (App.2004).

Buccheri–Bianca points out various inconsistencies in the children's testimony and the physical evidence collected at the scene. For example, he notes that M[] he had produced gifts for her and C[] from a blue gift bag in his closet but police found only a green and white bag in his closet. Buccheri–Bianca also points out that M[] and K[1] claimed Buccheri–Bianca would don gloves before touching them, yet police found no gloves in his apartment. He also highlights K[1]'s testimony that Buccheri–Bianca had tied him up with either thin, brown string or thick, brown rope, yet police found only white kitchen twine in the apartment. These inconsistencies, however, were matters for the jury's consideration in making its credibility determinations and weighing the evidence. *See Cox*, 217 Ariz. 353, ¶ 27, 174 P.3d at 269.

We conclude that the evidence presented was sufficient to survive a Rule 20 motion. All of the victims explained how Buccheri–Bianca had used his hands to touch or rub their genitals while they were in his apartment. All three children testified consistently that Buccheri–Bianca

had given them candy and other gifts, had separated them by gender when he molested them, and had threatened to kill their family if they reported him. Additionally, two forensic interviewers testified they had observed no evidence of "source monitoring," that is, no indication that the children's accusations were coached by someone else. We conclude the state presented substantial evidence of Buccheri–Bianca's guilt and the case was presented properly to the jury. The trial court therefore did not err in denying Buccheri–Bianca's motion for a judgment of acquittal.

(Answer, Exh. F at 19-21) (emphasis in original). The court also noted that: "Although Buccheri-Bianca testified he was innocent, it was within the jury's purview whether to believe his testimony." *Clemons*, 110 Ariz. at 557, 521 P.2d at 989." (*Id*. at 21 n.6).

Because the Arizona Supreme Court summarily denied review, the appellate court's decision is the last-reasoned state-court decision on this issue.

### b.    Standard on Habeas Review

Under the AEDPA, Petitioner's sufficiency of the evidence claim "face[s] a high bar…because [it is] subject to two layers of judicial deference." *Coleman v. Johnson,* 566 U.S. 650, 651 (2012). First, the Arizona appellate court was required to view the evidence in the light most favorable to the prosecution in making the determination whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). *See also Coleman,* 566 U.S. at 651. Moreover, "on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.'" *Coleman,* 566 U.S. at 651. Second, under the AEDPA, the federal habeas court may grant relief only if the Arizona court "'unreasonabl[y] appli[ed]' the already deferential *Jackson* standard, 28 U.S.C. §2254(d)(1), meaning that their application of law to facts was 'objectively unreasonable[.]'" *Kyzar v. Ryan,* 780 F.3d 940, 949 (9th Cir. 2015) (quoting *Williams,* 529 U.S. at 409)). *See also Sarausad v. Porter,* 479 F.3d 671, 677 (9th Cir.) ("[S]ection 2254(d)(1) plainly applies to *Jackson* cases….By contrast, §2254(d)(2) is not readily applicable to *Jackson* cases."), *vacated in part on other grounds on denial of rehearing,* 503 F.3d 822 (9th Cir. 2007) *and  rev'd on other grounds sub. nom. Waddington v. Sarausad,* 555 U.S. 179 (2009); *Juan H. v. Allen,*

408 F.3d 1262, 1274 (9th Cir. 2005) (same). A state court's application of Supreme Court precedent is objectively unreasonable when it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter,* 562 U.S. at 103.

In applying the *Jackson* standard, the federal habeas court must refer to the substantive elements of the criminal offense as defined by state law at the time that the petitioner committed the crime and was convicted, as well as look to state law to determine what evidence is necessary to convict on the crime charged. *See Jackson,* 443 U.S. at 324 n. 16; *Boyer v. Belleque,* 659 F.3d 957, 965 (9th Cir. 2011). The federal court must also not usurp the role of the factfinder by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson,* 443 U.S. at 318-19; *United States v. Brady,* 579 F.2d 1121, 1127 (9th Cir. 1978) (in applying the *Jackson* test, "it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts.").

Under Arizona law applicable to Petitioner, the crime of molestation of a child required proof that Petitioner intentionally or knowingly engaged in or caused a person to engage in any sexual contact, except sexual contact with the female breast, with a child who is under fifteen years of age. A.R.S. §13-1410(A) For purposes of child molestation, "sexual contact" is defined as including "any direct or indirect touching, fondling or manipulating of any part of the genitals, [or] anus…by any part of the body or by any object[.]" A.R.S. §13-1401(2).

### c.     Evidence at trial

The molestations were alleged to have occurred between August 1, 2008 and December 21, 2009 (*see* Answer, Exh. B; Supp. Answer, R.T. 5/1/12 at 154-57). Testimony was presented during the state's case that Petitioner and the victims had lived in the same apartment complex during the relevant time. (*See* Supp. Answer, R.T. 5/2/12 at 73, 83 (M); *id.* at 129-30 (victims' mother). The authorities apparently became

involved after M reported at school in late 2010 that Petitioner had touched her and her sister, C. (*See* Supp. Answer, R.T. 5/2/12 at 132, 137; Supp. Answer, R.T. 5/3/12 at 95; *see also*; Supp. Answer, R.T. 5/3/12 at 35-36). Interviews of the M, C, K1 and K2 by forensic interviewers from the Southern Arizona Child Advocacy Center revealed that all four siblings claimed to have been molested by Petitioner.[5]  Additionally, a teacher from the children's school testified that after M reported the molestation, K1 told the teacher that he had been touched, as well.  (Supp. Answer, R.T. 5/3/12 at 37-39).

Tucson Police Department Detective Stacy Lee, the lead investigator in the case, testified that: M described molestation occurring when she was nine years of age, and that M turned nine in August 2008; K1 described incidents of molestation when he was eight and nine years of age, and he turned eight in December 2008 and nine the following December; C described incidents of molestation occurring when she was in kindergarten, and she would have been in kindergarten during the 2008-2009 school year; and K2 described incidents of molestation when he was four or five years old, and he would have turned five in October 2008.  (Supp. Answer, R.T. 5/3/12 at 92, 99-100).  Detective Lee also testified that following the reports of molestation, a search warrant executed at Petitioner's apartment led to the discovery of: "two baskets and a bowl all containing various types of candy[,]" including Snickers bars, caramels and M&Ms, which were on Petitioner's table in the kitchen area, (*id.* at 103-07 (photos of same were admitted)); an unopened roll of "tan-colored string or twine" on the table in the kitchen area, (*id.* at 107, 118 (a photo of same was admitted)*; see also id.* at 118 (on cross-examination Detective Lee opined that the twine was "like the diameter of a thin yarn.")); what appeared to be

---

[5] The transcripts of the children's interviews by the forensic interviewers were extensively referred to during the children's testimony at trial. The forensic interviewers testified that they conducted the interviews according to established protocol, including that they not ask leading questions.  (Supp. Answer, R.T. 5/3/12 at 9, 48; *see also id*. at 11 (one interviewer interviewed M and K2); *id.* at 52 (the other interviewer interviewed C and K1.)).  The interviewers were also vigilant for indications of "source monitoring", which would suggest that prior to meeting with them, the child had been coached by an outside source about what to say or not to say during the interview.  (*Id.* at 15, 49).  The interviewers did not uncover any information that the children had been coached and they had no concerns that the children had been coached.  (*Id.* at 30, 52-53, 59-60).

white twine was also found in a laundry basket, (*id.* at 108 (a photo of same was admitted)); "a brown or reddish brown" chair in Petitioner's living room, (*id.* at 104 (a photo of same was admitted)); and a "small green and white gift bag" containing "a number of packages of condoms" was found on a shelf in Petitioner's closet, (*id.* at 109-111 (photos of same were admitted)). Detective Lee did not recall that any rubber gloves were found during the search and none were identified as evidence; had, such gloves been found, they would have been marked as evidence. (*Id.* at 124-25).

K1 was the first of the children to testify. He testified that he was seven years old when he met Petitioner. (Supp. Answer, R.T. 5/1/12 at 184; *see also Id.* at 197 (K1 was in the fifth grade when he testified)). K1 stated that Petitioner gave him and his siblings treats, including chips and "little candies…like chocolates", and that Petitioner kept the candies in a basket on his table inside his apartment. (*Id.* at 185). K1 testified that when he was about eight years old, Petitioner "started to touch me on my private parts…where I go pee and where I go to the—to the restroom." (*Id.* at 187). Petitioner touched K1 in the living room where Petitioner's brown chair was located. (*Id.* at 187). Petitioner told K1 "not to tell my family or else he was…going to kill my whole whole family." (*Id.*). When Petitioner touched K1 in the living room, Petitioner removed K1's pants and donned gloves before touching him. (*Id.* at 188 (Petitioner washed his hands before putting on the gloves); *see also id.* at 212 (on cross-examination K1 described the gloves as whitish, blue plastic gloves)). K1 testified that during another incident, Petitioner touched K1's "butt cheeks" and butt crack. (*Id.* at 189; *see also id.* at 192-93 (K1 testified that Petitioner touched his butt crack more than once)). Although Petitioner did not always wear gloves, he did wear gloves when he touched K1's bottom. (*Id.* at 189). K1 testified that even though he told Petitioner he did not like what Petitioner was doing, Petitioner "kept on doing it." (*Id.* at 190; *see also id.* (K1 testified that he did not like Petitioner touching him because "it feels weird when he touches me like.")). K1 also testified that when he did not want to be touched, Petitioner tied his hands with thick brown rope. (*Id.* at 191-92 (K1 testified that the tying occurred "a couple times. I don't

really remember.")).

On cross-examination, K1 testified that Petitioner would wash his hands with Clorox after he touched K1's butt crack. (*Id.* at 213). K1 agreed that he had told the forensic interviewer that Petitioner had washed his hands with Clorox before putting on the gloves. (*Id.* at 214).

C, who was nine years old and in third grade at the time of trial, testified next. (Supp. Answer, R.T. 5/2/12 at 8). C testified that when she and her sister M were at Petitioner's apartment, he sat C on his knee in the living room and put his hand inside of her pants, touching her "pee part." (*Id.* at 12-13 (also testifying that the living room had one couch and a television, but no chair); *see also id.* at 14 (stating that Petitioner did not take off her pants, but would "put his hand like inside of it and then it was still on, he'd just like unzip them.")). C testified that Petitioner touched her more than once and they were always in the living room when Petitioner touched her. (*Id.* at 13, 14). C testified that Petitioner's skin was against her skin every time he touched her "part that pees[]" (*Id.* at 16). She also testified about how Petitioner would move his hand when he was touching her. (*Id.* at 26) (redirect). C testified that "[i]t made me feel nasty. But I was going to tell my mom, but he said if I told my mom, he'll kill my…big brother, [K1]." (*Id.* at 13). C denied that Petitioner touched her in his bedroom. (*Id.* at 14). C also saw Petitioner touch M on "the same part." (*Id.* at 15; *see also id.* (C testified that Petitioner would not pull M's pants all the way down)).

Cross-examination included C's testimony that she told the interviewer that Petitioner touched the skin on the inside of the part she pees with. (*Id.* at 19). When shown that the transcript of the interview reflected that she told the interviewer that Petitioner touched her on the "outside of the pee place", C insisted that she "told [the interviewer] the inside." (*Id.* at 20). C testified that the last time Petitioner touched her, she was in kindergarten. (*Id.* at 18).

K2 testified on direct examination that he was currently eight years of age and in the second grade. (*Id.* at 29). Although K2 initially testified that he did not remember

the apartment where he had previously lived or a man named Pablo as their neighbor, "'[c]ause it was a long time ago[,]" he did testify that he remembered going to "Pablo's apartment": "I remember he was pretty nice and he used to invite us to his house, and also my dad." (*Id.* at 30-31). K2 testified that Petitioner had given him chocolate candy and there were times when K2 was in the apartment by himself. (*Id.* at 32). Although K2 remembered a time when Petitioner touched him in the bathroom, K2 did not remember where on his body Petitioner had touched him. (*Id.* at 32-33). Although K2 remembered telling the forensic interviewer that Petitioner had touched K2's "peeto" where K2 pees from, K2 could not remember whether Petitioner had touched him more than once. (*Id.* at 35-36). K2 testified that he could not remember anything about when Petitioner touched him. (*Id.* at 36). K2's description of the incidents of molestation were read into the record from the transcript of his interview with the forensic interviewer. K2 confirmed that he also told the interviewer that Petitioner had "taken care of" him and his siblings when his parents were in Mexico. (*Id.* at 53). K2 testified that although he did not remember much of the interview, he told the truth during that interview. (*Id.* at 44).

M, who was twelve years of age and in the sixth grade at the time of Petitioner's trial, testified that Petitioner would invite her and her siblings inside his apartment for candy that he kept in a basket. (*Id.* at 71-72, 75). M testified that Petitioner had a blue "present bag" and he gave her a bottle of perfume. (*Id.* at 75-76). M testified that on one occasion he told her and C to go into his bedroom and wait while he got the blue present bag out of his closet. (*Id.* at 76). In the bedroom, Petitioner pulled down C's pants and touched her "private parts." (*Id.* at 77). M testified that Petitioner wore white plastic gloves when he touched C in the bedroom. (*Id.* at 81 (Petitioner retrieved the gloves from his bathroom)). On another occasion, M saw Petitioner touch C over her clothes in his living room, where he had a brown chair. (*Id.* at 80).

M testified that on one occasion when her mother asked her and C to borrow some oil from Petitioner, he touched M's "front part…from where you pee[]" over her clothes while they were in his kitchen. (*Id.* at 78). M testified that on another occasion, after

helping Petitioner put groceries away, "he got me against one of his, um, one of his counters and he started touching…", over her clothes, the part where she pees from. (*Id.* at 81). M testified that Petitioner had touched her more than one time. (*Id.* at 80). When asked whether "anything" had happened to her in Petitioner's living room, M answered, "No." (*Id.* at 80).

M testified that Petitioner told her and C "that if we told[,] he was going to kill my brother, [K1], and then he was going to kill my family." (*Id.* at 79). She did not tell anyone because "I didn't want my family to get killed." (*Id.; see also id.* at 83).

During cross-examination, defense counsel referred to the transcript of M's interview with the forensic interviewer. M testified that she told the interviewer that she was in the third grade and was seven years old when the first incident occurred. (*Id.* at 101-02). M also testified that she "said she was nine at one point the first time…." (*Id.* at 116). M agreed that according to the transcript, she told the interviewer that Petitioner took off C's pants and touched C on the inside and outside of the place from where C pees. (*Id.* at 99). She told the interviewer that Petitioner touched her private parts and asked her and C to touch his. (*Id.* at 103). M also told the interviewer that the first time Petitioner touched her vagina, it was over her clothes in the kitchen. (*Id.* at 112; *see also id.* at 116 (Petitioner touched M's vagina over her clothes); *see also id. at* 114 (M also told the interview that Petitioner touched her vagina after he touched her bottom)). M described to the interviewer how Petitioner had touched her in the kitchen by standing behind her and moving his hand up and down over her clothes. (*Id.* at 112-13). M also told the interviewer that the last time Petitioner had touched her was in his living room when he touched her vagina and butt cheeks over her clothes. (*Id.* at 117-18; *see also id.* at 117-19 (M described to the interviewer how Petitioner stood behind her and touched her)). When defense counsel pointed out that details of the incident in the kitchen and the incident in the living room were "virtually identical…", M responded that she did not understand the question. (*Id.* at 119).

The children's mother testified that her family lived in the same apartment

complex as Petitioner in 2008 and 2009, and she was not sure of the year when they moved to a different location. (Supp. Answer, R.T. 5/2/12 at 129-30). She first learned about the molestations when M mentioned it at the school during a meeting concerning issues involving a substitute teacher. (*Id.* at 132; 144; *id.* at 147 (although she knew the meeting occurred on December 14th, because that is the date of one of her son's birthday, she was uncertain of the year the meeting occurred)). When M told school officials about the molestation, the family already had moved away from the apartment complex where Petitioner lived. (*Id.* at 134).

The children's mother testified that she never left the children in Petitioner's care overnight or when she and their father went to Mexico. (*Id.* at 147).

Petitioner, who was the only defense witness, testified in pertinent part that he had not met the children prior to 2011. (Supp. Answer, R.T. 5/3/12 at 156, 158-59; *see also id.* at 156-58 (Petitioner also testified that he "didn't associate until the 2010…."")). Petitioner denied touching the children, that the children entered his bedroom or bathroom other than to empty his trash, and that he ever watched the children while their parents were in Mexico. (*Id.* at 152-54, 170).

### d.    Analysis

On appeal, Petitioner argued to the state court that the children's testimony was "grossly inconsistent and grossly vague" and there was no forensic evidence to support their allegations "because they had reported their claims many months after the alleged offenses had occurred." (Answer, Exh. C at 48). Petitioner stressed that only one of the children correctly described the color of the chair in his living room[6] and the others did not; some of the children claimed Petitioner had a blue bag from which he would produce gifts for them, but the police only found a green and white bag; the children never remarked about condoms that were found in the green and white bag; the children's mother was not aware that Petitioner had given the children gifts; the police did not find

---

[6] The record actually reflects that M and K1 both described the chair as brown. (Supp. Answer, R.T. 5/1/12 at 187; Supp. Answer R.T. 5/2/12 at 80).

gloves as described by the children or Clorox, which some of the children claimed Petitioner used during the molestations; and no thick, brown string or rope was found in Petitioner's apartment, only white twine was found. (*Id.* at 48-50). In his habeas petition, Petitioner also appears to take question C's age at the time of the molestation. Although that contention was not expressly raised on direct appeal, Respondents have not challenged it as unexhausted.

Petitioner was ultimately convicted on the counts involving molestation of M, C, and touching K1's penis.[7] (Answer, Exh. A). The testimony presented described the kinds of acts Petitioner committed on M, C, and K1, the time period when the molestations occurred, and the children's ages during the relevant time. "The testimony of one witness…is sufficient to uphold a conviction." *United States v. Larios,* 640 F.2d 938, 940. Further, M and C testified about watching Petitioner touch the other. Petitioner's arguments that the evidence was insufficient to convict him amount to nothing more than an attempt to re-weigh the evidenced presented at trial. Where factual conflicts exist, it is the province of the jury to resolve those conflicts, "to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. Consistent with *Jackson,* the state court held that it was within the province of the jury to make credibility determinations and to weigh the evidence.[8] "If confronted by a record that supports conflicting inferences, federal habeas courts 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Bruce v. Terhune,* 376 F.3d 950, 957 (9th Cir. 2004) (quoting *Jackson,* 443 U.S. at 326). Therefore, the "jury's credibility determinations are ... entitled to near-total deference under *Jackson. Id.* at 957 (credibility contest between victim alleging sexual

---

[7] As to the counts on which the jury acquitted, sufficiency of the evidence review "should be independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell,* 469 U.S. 57, 67 (1984).

[8] The state appellate court did not cite *Jackson* in its decision. As discussed *supra,* for purposes of analysis under § 2254(d), the state court need not cite, or even be aware of, Supreme Court's cases. *Ortiz (Adilao),* 704 F.3d at 1035.

molestation and defendant's denials of same is not a basis for revisiting the jury's resolution of the conflict). There is no basis in the record to conclude that despite Petitioner's protestations of innocence, the victims' accounts of the molestations could not have occurred as described. *Cf. id.* at 958 (same where the court could not say that the victim's account of the incident was physically impossible and could not have occurred as described). In light of the trial testimony and given the high-level of deference the court must grant the jury's fact-finding, it is reasonable to conclude a rational trier of fact could have been persuaded beyond a reasonable doubt that Petitioner molested the children as described in the counts on which he was convicted. Accordingly, review of the full trial record supports the conclusion that the Arizona appellate court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, nor an unreasonable application of, *Jackson*.

## III. Conclusion

Petitioner's Ground One, Ground Two with regard to prosecutorial misconduct, Ground Three with regard to amendment of the indictment, and Ground Four are procedurally defaulted. Petitioner's Ground Two regarding cross-examination about the victims' immigration status and Ground Three regarding sufficiency of the evidence are without merit. Consequently, Petitioner is not entitled to federal habeas relief.

## IV. Recommendation

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, dismiss and deny Petitioner's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Non-Death Penalty). (Doc. 1).

Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District of Arizona, any party may serve and file written objections within **FOURTEEN (14) DAYS** after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within **FOURTEEN (14) DAYS** after being served with a copy.

Fed.R.Civ.P. 72(b)(2). No replies to objections shall be filed unless leave is granted from the District Court to do so. If objections are filed, the parties should use the following case number: **CV 15-00229-TUC-RM**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to review.

The record reflects that Petitioner's mail was recently returned as undeliverable (*see* Doc. 25). The ADOC Inmate Locator reflects that Petitioner is presently located in the prison's medical unit. *See https://corrections.az.gov/public-resources/inmate-datasearch*. Although it is Petitioner's responsibility to keep the Court apprised of his address, *see* LRCiv 83.3(d), Rules of Practice of the U.S. District Court for the District of Arizona, given that Petitioner is in the medical unit, the Clerk of Court is DIRECTED to mail a copy of this Report and Recommendation to Petitioner at his address of record in addition to the following address:

ASPC Florence-Central Unit-Medical
P.O. Box 8200
Florence, Arizona 85132

Additionally, IT IS ORDERED that within seven (7) days of being released from the medical unit, Petitioner shall file a Notice of Address with the Court informing the Court of his updated address. Petitioner is advised that his failure to comply with this Order may result in dismissal of this action for failure to comply with the Court's orders and rules, *see* LRCiv 83.3(d). (regarding notice of change of address), pursuant to Fed.R.Civ.P. 41(b).

Dated this 31st day of October, 2017.

Bernardo P. Velasco
United States Magistrate Judge